UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

DENNIS ELIJAH JEMISON,

                    Plaintiff,

v.

                                        Civil No. 2:23cv509

CITY OF VIRGINIA BEACH, et al.,

                    Defendants.


### OPINION AND ORDER

This matter is before the Court on a motion for summary judgment filed collectively by Defendants, Gabriel Gulley ("Officer Gulley"), Brenna Gonzales ("Officer Gonzales"), Sargent Daniel Brenner ("Sgt. Brenner"), the City of Virginia Beach, and the Virginia Beach Police Department. ECF No. 9. The Court finds that oral argument is unnecessary because the facts and legal argument are adequately presented in the parties' briefs. For the reasons set forth below, Defendants' motion for summary judgment is **GRANTED** as to all Defendants on all claims.

### I. PROCEDURAL BACKGROUND

Plaintiff Dennis Elijah Jemison ("Plaintiff"), appearing <u>pro se</u>, initiated this 42 U.S.C. § 1983 action on October 13, 2023, by filing an application to proceed <u>in forma pauperis</u> ("IFP Application"), along with a proposed Complaint. ECF Nos. 1; 1-1. Plaintiff's Complaint alleged that Defendants violated his constitutional rights when police officers entered Plaintiff's

house without his authorization and for the purpose of harassing him.  ECF No. 1-1, at 4.  The Court granted Plaintiff's IFP Application, and directed the Clerk to file Plaintiff's Complaint. ECF No. 2, at 1.  The Court explained, however, that because Plaintiff's Complaint failed to allege facts sufficient to state a claim for relief against Defendants, his Complaint was subject to dismissal under the required IFP screening process.  Id. at 2-3 (citing 28 U.S.C. § 1915(e)(2)).  Accordingly, the Court ordered Plaintiff to file an Amended Complaint within thirty days.  Id.

On December 15, 2023, Plaintiff filed an Amended Complaint alleging that after Plaintiff reported a burglary to 911 dispatchers, Officers Gulley and Gonzales entered his residence without authorization — under the direction of their supervisor Sgt. Brenner — to harass and retaliate against Plaintiff for being rude to the 911 dispatcher.  ECF No. 4, at 1.  Plaintiff contends that the officers' conduct violated his Constitutional rights under the First and Fourth Amendments.  Id. at 1-2.  Upon review of the Amended Complaint under the IFP screening process, the Court noted that "Plaintiff's Amended Complaint could benefit from additional details" and that the viability of certain claims remained uncertain; however, the Court allowed the action to proceed.  ECF No. 5, at 1-2.

On November 27, 2024, Defendants filed a motion for summary judgment and provided pro se Plaintiff with a Roseboro Notice

explaining the dispositive nature of the summary judgment motion. ECF No. 9, at 1-2.[1]   In support of their motion, Defendants submitted: (i) the affidavit of Administrative Technician Olivia Lee, ECF No. 10-1, at 2-7; (ii) a Computer Aided Dispatch System report, ECF No. 10-2; (iii) recordings of ten 911 calls, ECF Nos. 10-3 through 10-12; (iv) the affidavit of Officer Gulley ("Gulley Aff."), ECF No. 10-13; (v) video footage from Officer Gulley's body camera ("Gulley Video"), ECF No. 10-14; (vi) the affidavit of Officer Gonzales ("Gonzales Aff."), ECF No. 10-15; (vii) video footage from Officer Gonzales's body camera ("Gonzales Video"), ECF No. 10-16; (viii) the affidavit of Sgt. Brenner ("Brenner Aff."), ECF No. 10-17; and (ix) a letter from the Virginia Beach Police Internal Affairs Bureau, ECF No. 10-18.

On December 16, 2024, Plaintiff filed a timely opposition to Defendants' motion for summary judgment; however, Plaintiff did not attach any supporting materials.[2]   ECF No. 17.   Thereafter, Defendants filed a reply.   ECF No. 18.   Accordingly, Defendants' summary judgment motion is ripe for adjudication.

---

[1] On that same day, the Court also sent Plaintiff a standard Roseboro notice advising Plaintiff of the dispositive nature of the summary judgment motion and of his right to file a response.   ECF No. 12.

[2] Plaintiff did include copies of some of the exhibits submitted by Defendants in support of their summary judgment motion.   ECF No. 17, at 5-12.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

For purposes of summary judgment, the following are the undisputed material facts that are relevant to Plaintiff's First and Fourth Amendment actions:

On August 29, 2022, Plaintiff called the City of Virginia Beach's Emergency Communication and Citizen Services ("ECCS") telephone number (911) at roughly 7:28 p.m. reporting that someone had broken into his house. ECF Nos. 10-2; 10-3. After numerous additional calls between Plaintiff and ECCS dispatchers, a dispatcher placed a call for service for police officers to assist a citizen who had reported that "his house was broken into." ECF No. 10-2, at 2. Officers Gulley and Gonzales responded to this call and, roughly one hour and twenty minutes after Plaintiff first reported the burglary, the officers approached Plaintiff's residence. Id.; Gulley Video, at 06:17 – 06:30. They knocked on the front storm door and announced their presence as members of the Virginia Beach Police Department. Id.; Gulley Video, at 06:31 – 07:09. Officer Gulley observed that the front door was open and the storm door in front of it was closed, though the storm door was clear and he could see through it to the interior of the house. Gulley Video, at 07:10 – 09:06. Additionally, while inspecting the house from the doorstep, Officer Gulley observed that: (1) some windows were open and the house's lights were on; (2) the interior of the home appeared to be in disarray; and (3) there was no car

4

in the driveway. Id. at 7:26 – 9:04, 11:43 – 11:56. Officer Gonzales radioed an emergency dispatcher and asked them to contact Plaintiff and advise him that the officers were at his residence, Gonzales Video, at 4:54 – 5:03, but the operator was unable to reach Plaintiff, id. at 6:40 – 6:45; ECF No. 10-2. Although both officers thought that Plaintiff was supposed to be home, Gonzales Video, at 6:36 – 6:54; Gulley Video, 12:20 – 12:25, Plaintiff did not respond to the repeated knocks at his door, Gulley Video, at 6:32 – 9:32.

While the officers were waiting outside the house, Officer Gulley suggested to Officer Gonzales that they should "clear the house," but Gonzales stated that they should first call a sergeant and ask for advice. Id. at 9:10 – 9:34. Officer Gulley then called Sgt. Brenner and explained to him that the incident report showed that Plaintiff had been "very vulgar" to the dispatchers and "pretty much an ass to them." Id. at 10:59 – 11:42. Then, Officer Gulley briefed Sgt. Brenner regarding the burglary report, including that: (1) it did not sound like the burglary was in progress; (2) no one was answering the door despite the officers announcing their presence into the house; (3) it sounded like Plaintiff was home; (4) the front door and windows were "wide open" and the house was left unsecured; and (5) the house looked as if it could have been burglarized. Id. at 11:34 – 13:22.

Officer Gulley explained that based on these circumstances, he was considering "clear[ing] the house." Id. at 12:20 – 13:24; Gulley Aff. ¶¶ 6-7. After hearing from Officer Gulley, Sgt. Brenner approved the officers' request to enter the residence to conduct a welfare check. Brenner Aff. ¶ 4. The officers entered the residence, repeatedly and loudly announcing their presence and asking anyone present to announce themselves. Gulley Video, at 16:32 – 16:54. The officers first checked the ground floor, searching spaces where a person could possibly be located while continuing to loudly announce their presence. Id. at 16:55 – 18:27. After not finding anyone on the ground floor, they went upstairs. While announcing their presence and walking around the upper floor, Plaintiff came out of a room, ordered the officers to leave his house and asked for the officers' identifying information and for a supervisor to come to the house. Gonzales Video, at 16:30 – 17:12. The officers left the premises and asked Sgt. Brenner to come to the scene. Id. at 17:13 – 17:40.

Sgt. Brenner responded to the scene and talked with Plaintiff for roughly three minutes while standing on the public sidewalk parallel to the street. Id. at 31:08 – 33:49. Thereafter, Plaintiff informed the officers that he would press charges against them, asked them for their names and badge numbers, and — after the officers provided this information — asked them to leave. Id. at 33:50 – 34:46.

6

### III. STANDARD OF REVIEW

Summary judgment is appropriate only when a court, viewing the record as a whole in the light most favorable to the nonmoving party and drawing all inferences in their favor, determines that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party . . . [and] [a] fact is material if it might affect the outcome of the suit under the governing law." Jacobs v. N.C. Admin. Off of the Cts., 780 F.3d 562, 568 (4th Cir. 2015) (citations omitted). The moving party has the initial burden to show "the absence of an essential element of the nonmoving party's case" and to demonstrate that the moving party "is entitled to judgment as a matter of law." McLean v. Patten Cmtys., Inc.. 332 F.3d 714, 718 (4th Cir. 2003) (citing Celotex Corp., 477 U.S. at 322-23); Fed. R. Civ. P. 56.

Once the moving party has met this burden, the nonmoving party must then come forward with specific facts showing that there is a genuine issue of material fact for trial. Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 185 (4th Cir. 2004); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Importantly, the facts advanced in support of or in opposition to a summary judgment motion must be supported by:

7

(1) "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations; or (2) showing that the materials cited by the other party "do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1).  To successfully defeat a motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation," the "building of one inference upon another," the "mere existence of a scintilla of evidence," or the appearance of "some metaphysical doubt" concerning a material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002).  Rather, there must be sufficient evidence that would enable a reasonable fact finder to return a verdict for the nonmoving party.  See Anderson, 477 U.S. at 252.

Although the Court is not "to weigh the evidence and determine the truth of the matter" at the summary judgment phase, the Court is required to "determine whether there is a genuine issue for trial."  Tolan v. Cotton, 572 U.S. 650, 656 (2014) (quoting Anderson, 477 U.S. at 249); see Jacobs, 780 F.3d at 568-69.  In determining whether there is a genuine issue for trial, "[t]he relevant inquiry . . . is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of

law.'" <u>United States v. 8.929 Acres</u>, 36 F.4th 240, 252 (4th Cir. 2022) (quoting <u>Anderson</u>, 477 U.S. at 251-52).

## IV. DISCUSSION

As explained above, Plaintiff's Amended Complaint advances claims under the First and Fourth Amendments, and Defendants move for summary judgment as to both claims. First, the Virginia Beach Police Department argues that it is not a proper party to this lawsuit. ECF No. 10, at 9-10. Second, Officers Gulley and Gonzales and Sgt. Brenner contend that they are entitled to qualified immunity. Id. at 10. Third, the City of Virginia Beach asserts that it is not subject to municipal liability. Id. at 18-20. The Court addresses each argument in turn.

### A. Propriety of the Virginia Beach Police Department as a Defendant

Defendants' summary judgment motion contends that the Virginia Beach Police Department is not a proper party to this lawsuit because it is not a separate entity from the City of Virginia Beach and should therefore be dismissed. ECF No. 10, at 9-10. This Court has previously held in the context of a § 1983 action that the Virginia Beach Police Department is not a viable defendant because it is not a separate legal entity distinct from the City of Virginia Beach and it is not considered a "person" under 42 U.S.C. § 1983. <u>Richards v. City of Va. Beach</u>, No. 2:09cv75, 2009 U.S. Dist. LEXIS 145011, at *21 (E.D. Va. June 12,

9

2009); see, e.g., Hunt v. West Columbia Police Dept., No. 3:14-70, 2015 U.S. Dist. LEXIS 91121, at *2 (D.S.C. July 16, 2015) (explaining that a police department "is an instrumentality of a municipality — not an independent entity — and thus is not a 'person' within the meaning of § 1983"). Therefore, because the Court finds that the Virginia Beach Police Department is not a viable defendant in this § 1983 claim, Defendants' summary judgment motion is **GRANTED** and the Virginia Beach Police Department is dismissed.

### B. Qualified Immunity – Named Police Officers

Law enforcement officers sued under § 1983 enjoy qualified immunity "when performing their duties within the scope of their employment insofar as their conduct does not breach 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Sigman v. Town of Chapel Hill, 161 F.3d 782, 786 (4th Cir. 1998) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity is not merely a defense to liability, but is "an immunity from suit," and courts must therefore "scrutinize and dismiss appropriate cases on qualified immunity grounds early in the litigation." Id. This protection "balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties

reasonably."  Yates v. Terry, 817 F.3d 877, 884 (4th Cir. 2016)
(quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).

To determine whether an officer is entitled to qualified
immunity, courts engage in a two-part inquiry.  Under the first
prong, the court must "determine whether the facts, taken in the
light most favorable to the non-movant, establish that the officer
violated a constitutional right."  Id. (citing Saucier v. Katz,
533 U.S. 194, 201 (2001)).  Under the second prong, the Court must
determine whether the right that the officer violated was "clearly
established."  Id.  Importantly, if a court finds that the right
at issue was not clearly established, the court can resolve the
qualified immunity inquiry on the second prong alone and is not
required to determine "whether a constitutional violation actually
occurred."  Crouse v. Town of Moncks Corner, 848 F.3d 576, 584
(4th Cir. 2017); see also Pearson, 555 U.S. at 236 (explaining
that courts have discretion to decide which prong of the qualified
immunity analysis to address first).

### 1. Fourth Amendment Claim

Plaintiff's first cause of action alleges that the officers'
unauthorized warrantless entry into his home violated his Fourth
Amendment right to be free from unlawful searches.  ECF No. 4, at
1-2.  Under the two-prong qualified immunity test, this Court does
not directly resolve the constitutionality of the officers'
actions because even assuming, without deciding, that the

officer's actions violated Plaintiff's Fourth Amendment rights, Defendants are entitled to qualified immunity as it is readily apparent that the alleged right at issue was not "clearly established."

A clearly established right is one that is "sufficiently clear [such] that every reasonable official would have understood that what he is doing violates that right." Reichle v. Howards, 566 U.S. 658, 664 (2012) (cleaned up). "A right can be clearly established by cases of controlling authority in this jurisdiction or by a consensus of persuasive authority from other jurisdictions." Sharpe v. Winterville Police Dep't, 59 F.4th 674, 683 (4th Cir. 2023). Importantly, the "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Mullenix v. Luna, 577 U.S. 7, 12 (2015) (quotation marks omitted); see also Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011) (explaining that courts must not "define clearly established law at a high level of generality"). There need not be a case "directly on point" for a reasonable officer to know that their conduct violates a clearly established right, "but existing precedent must have placed the statutory or constitutional question beyond debate." Crouse v. Town of Moncks Corner, 848 F.3d 576, 583 (4th Cir. 2017) (quoting al—Kidd, 563 U.S. at 741). Said differently, unless the defendants

12

are "plainly incompetent" or "knowingly violate the law," they will be afforded protection. Mullenix, 577 U.S. at 12.

Here, Plaintiff argues in his Fourth Amendment claim that the officers violated his constitutional rights when they conducted a warrantless search inside his house. ECF No. 4, at 1. The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Accordingly, unless one of the limited exceptions to the warrant requirement applies, "warrants are generally required to search a person's home or his person." Mincey v. Arizona, 437 U.S. 385, 393-94 (1978). Defendants do not dispute that the officers' welfare check constituted a warrantless search; instead, they argue that the search was proper under the "exigent circumstances" exception to the Fourth Amendment's warrant requirement. ECF No. 10, at 10-15.

The exigent circumstances exception provides that a police officer "may enter the home if the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." United States v. Taylor, 624 F.3d 626, 631 (4th Cir. 2010). One "subset of the exigent circumstances exception" is the emergency aid doctrine, United States v. Curry, 965 F.3d 313, 322 n.5 (4th Cir. 2020), which allows police officers to make

13

"warrantless entries and searches when they reasonably believe
that a person within is in need of immediate aid," Mincey, 437
U.S. at 392.  For the emergency aid exception to apply, the officer
must have an "objectively reasonable belief that an emergency
existed that required immediate entry," United States v. Moss, 963
F.2d 673, 678 (4th Cir. 1992), and such belief "must be based on
specific articulable facts and reasonable inferences that could
have been drawn therefrom."   United States v. Yengel, 711 F.3d
392, 397 (4th Cir. 2013).

   Turning to the "specific context" of this case, the undisputed
evidence, and the relevant disputed evidence construed in
Plaintiff's favor, shows that Officers Gulley and Gonzales
responded to a call for service to assist a citizen who had:
(1) reported a burglary at his house using the emergency 911
system; and (2) asked for the police to come to his house.[3]  ECF

_____

[3] Plaintiff's opposition brief argues that he never asked the ECCS dispatcher
to send police officers to his house and that he was "calling 911 for an
insurance police report."   ECF No. 17, at 2.   However, the 911 call
recordings contradict Plaintiff, as he referred to police assistance four
separate times during these calls.  See, e.g., ECF Nos. 10-3 ("[E]ither you
going to send the . . . cops or you ain't lady"); 10-4 ("I called for police
to come.").  And even if the Court accepted Plaintiff's unsupported position
that he never expressly asked for the police to come, the officers never
heard Plaintiff's precise statements to the 911 dispatchers and they instead
reasonably relied on the words of the ECCS incident report, which explained
that the officers were to "assist [a] citizen" who "sa[id] his house was
broken into."   ECF No. 10-2, at 1-2; Gulley Video, at 02:25 – 04:12; see
United States v. Avagyan, 164 F. Supp. 3d 864 (E.D. Va. 2016) (explaining
that "officers are entitled to rely on information communicated by
dispatchers in assessing reasonable suspicion").   Therefore, it is
undisputed that Officers Gulley and Gonzales responded to a call for service
to assist a citizen who reported a burglary on the 911 emergency line — not
a call for an insurance police report.

14

Nos. 10-2; 10-3; 10-4.  Roughly one hour and twenty minutes later, Officers Gulley and Gonzales arrived at Plaintiff's house.[4]  Gulley Video, at 6:24.  While standing on the front porch in the dark, the officers observed through the clear storm door that the house was in a state of disarray, and after repeatedly knocking and announcing their presence, they received no response from within the residence.  Id. at 6:32 – 9:32.  Moreover, the dispatchers were unable to contact Plaintiff at his phone numbers on record. Gonzales Video, at 6:36 – 6:54; ECF No. 10-2.  When asking Sgt. Brenner for advice, Officer Gulley noted that "it did not sound like [the burglary] was in progress," and later explained that he "could not tell whether or not [the house] was broken into or if [Plaintiff] just was frustrated and left the door open and left." Gulley Video, at 11:34 - 11:56.  Officer Gulley also told Sgt. Brenner at one point that he wanted to clear the house because he had loudly announced his presence inside the house but no one had answered, stating that "the longer [he was] [t]here on scene the longer [his] mind started to turn" and he was having more "thoughts."  Id. at 13:06 – 13:23.  Based on these circumstances, the officers believed that Plaintiff was possibly in danger and

---

[4] Although it is undisputed that the timeframe between Plaintiff's initial contact with 911 dispatchers and the officers' arrival on the scene was over an hour, the incident report indicates that the officers responded to the call for service within seconds of being contacted by dispatch.  ECF No. 10-2, at 1.  The officers arrived on scene roughly nine minutes after being dispatched.  Id.

required police assistance and, after receiving Sgt. Brenner's approval, Officers Gulley and Gonzales entered the house. Gulley Aff. ¶¶ 7-8; Gonzales Aff. ¶¶ 6-8.

The dispositive question on this record of undisputed facts is whether it was clearly established that a reasonable officer in these or similar circumstances would understand that the emergency aid exception did not apply and that conducting a warrantless welfare check would violate the Fourth Amendment? The answer is no.

A review of relevant caselaw reveals that neither the United States Supreme Court, the Fourth Circuit, nor the Virginia Supreme Court have held that the emergency aid exception is inapplicable in these or similar circumstances.[5] This Court has also been unable to identify a "robust consensus of persuasive authority that would have given [the officers] 'fair warning that their conduct,' under the circumstances, 'was wrongful.'" Williams v. Strickland, 917 F.3d 763, 769 (4th Cir. 2019) (internal citations omitted). To the contrary, the contours of the emergency aid doctrine, as applied when police officers respond to a 911 call to assist a citizen who reported a burglary (but then fails to answer

---

[5] Cf. Caniglia v. Strom, 593 U.S. 194, 202 (2021) (Alito J., concurring) (explaining that the Court has not addressed cases "involving warrantless, nonconsensual searches of a home [to determine] whether a resident is in urgent need of medical attention and cannot summon help").

his phone or the door), has rarely been addressed in any published opinions.

Review of the limited decisions from other circuits applying the emergency aid exception to similar circumstances further shows the unsettled state of the law. For instance, the Sixth and the Tenth Circuit have reached opposite conclusions as to whether the exception applies when a person dials 911 but then does not communicate with the dispatcher or answer the door for responding officers. The Sixth Circuit held that "the combination of a 911 hang[-up] call, an unanswered return call, and an open door with no response from within the residence is sufficient" to have "an objectively reasonable basis for believing that a person within the house was in need of immediate aid." Johnson v. City of Memphis, 617 F.3d 864, 869-70 (6th Cir. 2010). In contrast, the Tenth Circuit held that the emergency aid doctrine did not apply based on: (1) a static 911 call from the residence; (2) a return call from the dispatcher with only static on the line; (3) a disordered house; (4) an unlocked clear sliding glass back door; (5) electronics boxes near the door; and (6) officers repeatedly announcing their presence without response. United States v. Martinez, 643 F.3d 1292, 1296-1300 (10th Cir. 2011). Importantly, the Martinez Court distinguished these facts from the facts of Johnson explaining that while a hang-up call and unanswered return calls possibly indicated that "the caller or the phone had somehow

17

been incapacitated," a static 911 call did not even reveal whether a person had initiated the 911 call.  Id.

Here, the unsettled law did not provide the officers with clear guidelines as to whether the facts before them — including that Plaintiff was possibly incapacitated as he was not answering the phone or door after he had called 911 multiple times and asked for police assistance regarding a recent burglary — were sufficient to believe that Plaintiff needed immediate aid.  See Springmen v. Williams, 122 F.3d 211, 214 (4th Cir. 1997) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.").[6]  Therefore, because it was not clearly established on the undisputed facts before the Court that the emergency aid doctrine was inapplicable, the Court finds that Officer Gulley, Officer Gonzales, and Sgt. Brenner are entitled to qualified immunity.  Accordingly, Defendant's motion for summary judgment is **GRANTED** as to the Fourth Amendment claims against Officer Gulley, Officer Gonzales, and Sgt. Brenner.

### 2. First Amendment Claim

Similar to Plaintiff's Fourth Amendment claim, Officers Gulley and Gonzales, and Sgt. Brenner, also move for summary

---

[6] The body camera footage reveals the officers' ongoing discussion about whether the exigencies were sufficient to conduct a welfare check inside the home and their decision to seek guidance from a superior in the face of an apparent close call.  Gulley Video, at 07:23 – 15:55.  Regardless of whether Officer Gulley, Officer Gonzales, or Sgt. Brenner made the "right" call regarding entry, the undisputed evidence reveals that, at worst, they made a bad guess in a gray area.

judgment on Plaintiff's First Amendment retaliation claim based on qualified immunity. ECF No. 10, at 15-18. Plaintiff's First Amendment claim argues that Defendants violated his constitutional right to be free from retaliation by a public official after engaging in protected speech. ECF No. 4, at 1-2. Plaintiff specifically contends that the officers entered his house illegally with the intent to intimidate and harass him because he had allegedly been rude to the 911 dispatchers. Id.

When analyzing the first prong of the qualified immunity test at the summary judgment stage, the Court must determine "whether the facts, taken in the light most favorable to the non-movant, establish that the officer violated a constitutional right." Yates, 817 F.3d at 884. To succeed on a First Amendment retaliation claim, a plaintiff must prove that "(1) []he engaged in protected First Amendment activity, (2) the defendant[] took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendant['s] conduct." Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017) (alteration in original). Because Defendants readily concede that Plaintiff engaged in First Amendment protected activity when he was purportedly rude to the 911 dispatchers, ECF No. 10, at 16, the Court turns to whether there is a genuine dispute of material fact regarding the second and third elements of Plaintiff's retaliation claim.

Regarding the second element, the Court of Appeals has explained that a plaintiff has suffered an adverse action "if the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005) (internal citations omitted). That is, the plaintiff must "show that the defendant[s'] conduct resulted in something more than a 'de minimis inconvenience'" to their exercise of constitutional rights. Id. Additionally, "context matters," and "the significance of any given act of retaliation will often depend upon the particular circumstances." Williams v. Mitchell, 122 F.4th 85, 90 (4th Cir. 2024) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 69 (2006)).

Defendants argue that summary judgment is proper because no reasonable person in Plaintiff's position would be deterred from calling 911 after the police "responded to [his] request for police assistance" and later "entered the home to conduct a welfare check consistent with the . . . Fourth Amendment." ECF No. 10, at 16. Importantly, Defendants' argument relies on the premise that the officers' warrantless entry into Plaintiff's home was valid under the Fourth Amendment. However, because this Court assumed in the preceding section that such entry violated Plaintiff's Fourth Amendment rights, supra Part. III.A., the Court will assume the same for purposes of analyzing Plaintiff's retaliation claim.

Yates, 817 F.3d at 884.   In light of this assumption, Defendants

fail to show that, as a matter of law, the assumed violation of

Plaintiff's Fourth Amendment rights is not materially adverse to

Plaintiff's First Amendment rights.   Nor could they, as there is,

at a minimum, a genuine factual dispute as to whether "a person of

ordinary firmness" in Plaintiff's position would be deterred from

exercising his free speech rights if doing so meant his home would

be subject to a warrantless search.   Constantine, 411 F.3d at 500.

Therefore, Defendants fail to show the absence of a genuine dispute

of material facts as to the second element of Plaintiff's

retaliation claim.

     Moving to the third element of Plaintiff's retaliation claim

— causation — the Court of Appeals has explained that the causal

requirement for a retaliation claim is "rigorous."     Raub v.

Campbell, 785 F.3d 876, 885 (4th Cir. 2015).   It is not enough to

establish "that the protected expression played a role or was a

motivating factor in the retaliation," but instead the plaintiff

"must show that 'but for' the protected expression the state actor

would not have taken the alleged retaliatory action."   Id. (quoting

Huang v. Bd. of Governors of the Univ. of N.C., 902 F.2d 1134,

1140 (4th Cir. 1990)); see also Nieves v. Bartlett, 587 U.S. 391,

399 (2019) (explaining that in a First Amendment retaliation claim

the plaintiff must prove "that the adverse action against the

plaintiff would not have been taken absent the retaliatory

motive"). Defendants' summary judgment motion relies on Officers Gulley and Gonzales's body camera videos and to the officers' sworn affidavits to argue that, based on the evidentiary record, no reasonable jury could find that the officers entered Plaintiff's house — or that Sgt. Brenner authorized such entry — because of Plaintiff's rude conduct towards ECCS dispatch. ECF No. 10, at 17-18. Plaintiff's opposition brief similarly cites to the officers' body camera videos, arguing that they show that the officers entered his house "in retaliation for talking like an ass to [the ECCS dispatch]." ECF No. 17, at 2-3.

Based on the parties' positions on summary judgment, the resolution of the causation element at this stage turns primarily on what the body camera videos show. The video reveals that when Officer Gulley first introduced the situation to Sgt. Brenner, he relayed the fact that the incident report reflected that Plaintiff had been unnecessarily vulgar to ECCS dispatch and "pretty much an ass to them." Gulley Video, at 11:25 - 11:42. Officer Gulley also told Sgt. Brenner that: (1) there had been multiple calls for service at this house; (2) he had heard that Plaintiff had been "very aggressive to [other] officers"; and (3) while Plaintiff had never been aggressive to Officer Gulley, other officers, including Officer Gonzales, have had issues with Plaintiff. Id. at 11:57 - 12:15. Moreover, before arriving to the residence, Officers

22

Gulley and Gonzales discussed previous experiences that they had
allegedly had with Plaintiff over the phone.[7] Id. at 02:00 – 03:14.

At most, construing this evidence in the light most favorable
to Plaintiff and drawing every reasonable inference in his favor,
as the Court must at this stage, Plaintiff may have established a
dispute of material fact as to whether Plaintiff's behavior towards
the emergency dispatchers was one of the factors considered by
Officers Gulley and Gonzales and Sgt. Brenner when deciding to
enter the house.  But that is not what Plaintiff is required to
prove to establish causation for his retaliation claim; rather,
Plaintiff must establish that Officers Gulley and Gonzales would
not have entered the house — or that Sgt. Brenner would not have
approved this entry — "but for" Plaintiff's purportedly rude
conduct.  Raub, 785 F.3d at 885.

Having reviewed the entirety of the footage of the officers'
body cameras, it is clear that this evidence does not suggest, nor
can it support the reasonable inference, that the dispositive
reason why Officers Gulley and Gonzales entered the house — or

---

[7] Because Plaintiff claims that neither Officer Gulley nor Officer Gonzales
had been to his house prior to that night, ECF No. 17, at 1, the Court does
not make any determinations as to whether the officers' statements about
previous encounters with Plaintiff were accurate.   Moreover,   the
conversation about the officers' prior experiences with Plaintiff is merely
context provided by the Court for completeness, because Plaintiff's
retaliation claim does not turn on whether the officers retaliated against
him based on the officers' past experiences with Plaintiff, but rather,
whether they retaliated against Plaintiff because of his rude comments to
911 dispatchers on August 29, 2022.

Sgt. Brenner approved this entry — was Plaintiff's rude behavior. The body camera footage reveals that both officers actually hesitated for several minutes when deciding whether they should conduct a welfare check.    After Officer Gulley inspected the interior of the house through the storm door, he noted that the main door was open and that no one was answering and suggested to "clear" the house, Gulley Video, at 7:25 – 9:07, but Officer Gonzales told Gulley to ask a sergeant for advice, stating that "[Plaintiff] should be home" and that this was not an alarm call. Gonzales Video, at 6:50 – 7:08.  Throughout this interaction, the video footage undisputably proves that the officers only discussed circumstances relevant to the state of the house, Plaintiff's lack of response, and whether it was proper to clear the residence. Notably, between the officers' arrival at the residence and their decision to call a supervisor for approval, Officers Gulley and Gonzales did not once discuss Plaintiff's rude comments to the dispatchers.

Thereafter, Officer Gulley discussed the case with Sgt. Brenner. Here, apart from Officer Gulley explaining that Plaintiff had been rude towards dispatchers and that both officers had previous experiences with Plaintiff, Officer Gulley also discussed the state of the house and Plaintiff's lack of response despite the fact that "it sounded like [Plaintiff] was home."   Gulley Video, at 11:20 - 15:55.    Then, Officer Gulley expressed

24

uncertainty as to what would be the proper course of action considering Plaintiff's lack of response. Id. at 13:06 – 13:23 ("I kind of want to just clear it because I have screamed inside 'Virginia Beach Police, Beach Police.' No one is answering, no one is saying anything. The longer I am here on scene the longer my mind starts to turn . . . ."). And immediately before Sgt. Brenner approved the welfare check, Officer Gulley's discussion continued to focus only on the state of the house. Id. at 14:56 – 15:14 ("Lights are on inside . . . No, I don't hear anything but I mean it could be . . . it looks like it could be a burglary had gone through [sic], I don't know."). For her part, Officer Gonzales reiterated her confusion as to Plaintiff's lack of response to the return calls by the ECCS. Id. at 15:50 – 15:52. But neither officer commented again on Plaintiff's original 911 calls where he had been purportedly rude to the dispatchers. Additionally, there is no evidence in the body camera footage suggesting that Sgt. Brenner discussed or considered Officer Gulley's comments regarding Plaintiff's conduct in his 911 calls when Sgt. Brenner approved the officers' request to conduct a welfare check.

The officers' conduct discussed immediately above may suggest that they were unsure as to whether they could (or should) enter Plaintiff's house. But Officer Gulley's limited comments regarding Plaintiff's 911 calls do not create a genuine issue of

material fact as to whether Officers Gulley and Gonzales would not
have entered the house — or Sgt. Brenner would not have approved
this entry — "but for" their purported desire to punish Plaintiff
for his rude comments to the dispatchers. Raub, 785 F.3d at 885.
Therefore, the Court finds that based on the video footage, which
is the only evidence in the record that Plaintiff cites in
opposition to Defendants' summary judgment motion, no reasonable
jury could find that the dispositive reason why Officers Gulley
and Gonzales entered the house was Plaintiff's prior comments to
the dispatchers.[8]

    Outside of the body camera footage, the rest of the record is
similarly devoid of any evidence from which a reasonable juror
could infer that the tone of Plaintiff's conversations with the
dispatchers was the "but-for cause" of the officers' welfare check.
The sworn affidavits by Officers Gulley and Sgt. Brenner state
that Sgt. Brenner never directed or suggested the officer to enter
Plaintiff's residence in "retaliation for Plaintiff's interactions
with 911 call takers" and that the officers only entered the house
to conduct a welfare check. Gulley Aff. ¶¶ 7-8; Brenner Aff. ¶¶ 6,
8. In response, Plaintiff merely avers that the recordings of his

---

[8] This Court's role, of course, is not to "weigh the evidence" on summary
judgment and it takes great care to be faithful to that role. Anderson,
477 U.S. at 249. But "[m]ere unsupported speculation . . . is not enough
to defeat a summary judgment motion," Ennis v. Nat'l Ass'n of Bus. & Educ.
Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995), as amended (Mar. 14, 2008),
and here, the video footage undermines Plaintiff's speculative assertion
that the dispositive cause for the officer's entry was his rude behavior.

calls with the dispatchers and the officers' body camera footage shows that these affidavits are false and misleading. ECF No. 17, at 3. Yet Plaintiff fails to cite to "particular parts of" the officers' body camera footage to establish that: (1) the officer's affidavits are false; or (2) Defendants failed to demonstrate the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1). And because "a party may not defeat a properly supported motion for summary judgment merely by raising generalized questions as to the credibility of the movant's affiants," Plaintiff's unsupported allegations that the affidavits are false are not enough to create a genuine issue of material fact. Eaton v. Nat'l Broad. Co., 972 F. Supp. 1019, 1024 (E.D. Va. 1997).

In summary, because Plaintiff has not pointed to any evidence that would permit a reasonable jury to find or infer that Officers Gulley and Gonzales would have not entered Plaintiff's house "but for" his protected speech — that is, being rude to 911 dispatchers — the Court finds that Officers Gulley and Gonzales, and Sgt. Brenner, are entitled to qualified immunity. Accordingly, Defendant's motion for summary judgment is **GRANTED** as to Plaintiff's First Amendment claim against Officer Gulley, Officer Gonzales, and Sgt. Brenner.

### C. Municipal Liability

The only remaining defendant in this action, the City of Virginia Beach ("the City"), also moves for summary judgment as to

all claims. ECF No. 10, at 18-20.  The City argues that Plaintiff
has failed to establish that: (1) there was an underlying
constitutional violation; and (2) the City deprived Plaintiff of
his federal statutory or constitutional rights through an
"official policy or custom."  ECF No. 10, at 18-19.  Here, the
Court assumes again, as it did in its qualified immunity
discussion, that the officers violated Plaintiff's Fourth
Amendment rights.  Supra Part. III.A.[9]  Yet this assumption does
not save Plaintiff's claim against the City, because, based on the
undisputed evidence, no reasonable jury could find that this
presumed violation was the result of the City's official policy or
custom.

"[I]t is well established that a municipality cannot be held
liable simply for employing a tortfeasor."  Riddick v. Sch. Bd.,
238 F.3d 518, 522 (4th Cir. 2000) (citing Monell v. Dep't of Soc.
Servs., 436 U.S. 658, 691 (1978)).  To subject a municipality to
liability under § 1983, a plaintiff must show that the municipality
caused a deprivation of a federal statutory or constitutional right
"through an official policy or custom."  Carter v. Morris, 164

---

[9] Because the Court held above that Plaintiff has failed to advance evidence
capable of establishing a First Amendment retaliation claim at the summary
judgment stage, supra Part III.B, the only cause of action under which the
City could potentially be subject to municipal liability is the presumed
Fourth Amendment violation, on which the Officers have qualified immunity.
Such qualified immunity, however, does not extend to the City.  Santos v.
Frederick County Bd. of Comm'rs, 725 F.3d 451, 470 (4th Cir. 2013)
("[Q]ualified immunity does not extend to municipal defendants.").

F.3d 215, 218 (4th Cir. 1999). An unconstitutional official policy

or custom can arise in four ways:

> (1) through an express policy, such as a written
> ordinance or regulation; (2) through the decisions of a
> person with final policymaking authority; (3) through an
> omission, such as a failure to properly train officers,
> that "manifest[s] deliberate indifference to the rights
> of citizens"; or (4) through a practice that is so
> "persistent and widespread" as to constitute a "custom
> or usage with the force of law."

Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (alteration in

original) (quoting Carter, 164 F.3d at 217).

In addition to identifying an unconstitutional policy or

custom, a plaintiff must also show that such policy or custom is

"the moving force behind the particular constitutional violation."

Spell v. McDaniel, 824 F.2d 1380, 1387 (4th Cir. 1987) (cleaned

up). Importantly, when "a plaintiff claims that the municipality

has not directly inflicted an injury, but nonetheless has caused

an employee to do so, rigorous standards of culpability and

causation must be applied to ensure that the municipality is not

held liable solely for the actions of its employee." Bd. of the

Cnty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997); Monell, 436 U.S.

at 691 (explaining that based on the text of § 1983 "Congress did

not intend municipalities to be held liable unless action pursuant

to official municipal policy of some nature caused a constitutional

tort" and holding that "a municipality cannot be held liable under

§ 1983 on a respondeat superior theory").

Here, Defendants' summary judgment motion points to the lack of any evidence in the record "demonstrating an unconstitutional custom, pattern, or practice" that could expose the City of Virginia Beach to municipal liability.   ECF No. 10, at 19. Plaintiff's only apparent attempt to establish an unconstitutional policy or custom is found in his Amended Complaint.[10]   There, Plaintiff appears to argue that the City has a persistent and widespread practice to curtail the constitutional rights of African Americans.  ECF No. 4, at 2 ("These types of things happen to black people all the time.").  However, Plaintiff has failed to proffer any evidence to support this allegation.  Despite the fact that pro se litigants are generally afforded leniency due to their lack of legal training, all litigants remain subject to the requirement that, at the summary judgment stage, "a plaintiff 'may not rest on [his] pleadings, but must demonstrate that specific, material facts exist that give rise to a genuine issue' that must be tried before a jury."   Blair v. Ravenswood Vill. Health Ctr.,

---

[10] Plaintiff's opposition to the summary judgment motion references another lawsuit against the City involving the wrongful shooting of an innocent man which was ultimately settled.   ECF No. 17, at 3.   To the extent that Plaintiff argues that this is evidence of a policy or custom by the municipality, the Supreme Court has explained that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose municipal liability, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."   Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985).   Therefore, absent any other details or context involving this other unfortunate event, the Court finds that such incident is not evidence that the City has a custom or policy of violating constitutional rights.

43 F. Supp. 2d 586, 586 (S.D.W. Va. 1998) (quoting Harleysville Mut. Ins. Co. v. Packer, 60 F.3d 1116, 1120 (4th Cir. 1995)) (internal quotations and citation omitted).     Therefore, this allegation in the Amended Complaint, unsupported by any evidence in the summary judgment record, cannot create a genuine dispute of material fact as to whether the purported violation of Plaintiff's constitutional rights was the result of a persistent and widespread unconstitutional practice or custom.

Although Plaintiff's Amended Complaint contains this single allegation of a claimed unconstitutional policy or custom, Plaintiff has not cited to any record evidence showing a: (1) custom or policy; (2) decision from a policymaker; (3) an omission from the City that establishes a widespread pattern of Fourth Amendment violations by the municipality; or (4) a persistent and widespread unconstitutional practice.     Lytle, 326 F.3d at 471.     Therefore, because Plaintiff has failed to identify a genuine dispute as to whether the City had an unconstitutional policy or custom that was the moving force behind the violation of Plaintiff's Fourth Amendment rights, the Court finds that the City is not subject to municipal liability.     Accordingly, the Court **GRANTS** Defendants' summary judgment motion as to all claims against the City.

## V. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment, ECF No. 9, is **GRANTED** as to all Defendants on all claims. Plaintiff may appeal this Opinion and Order by forwarding a written notice of appeal to the Clerk of the United States District Court, Norfolk Division, 600 Granby Street, Norfolk, Virginia 23510. The written notice must be received by the Clerk within thirty (30) days from the date of entry of this Opinion and Order. If Plaintiff wishes to proceed in forma pauperis on appeal, the in forma pauperis application shall be submitted to the Clerk of the United States Court of Appeals, Fourth Circuit, 1100 E. Main Street, Richmond, Virginia 23219.

The Clerk is **DIRECTED** to send a copy of this Opinion and Order to Plaintiff and all counsel of record.

IT IS SO **ORDERED**.

/s/

Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
August  7  , 2025